## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## OSMAR LOVAINA-BURMUDEZ,
aka Osmar Lovaina-Bermudez,
Osmar Lovaina Burmudez,
*Defendant-Appellant.*

Multnomah County Circuit Court
090933711; A145464

303 P3d 988

Robin A. Jones, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Rolf C. Moan, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

HASELTON, C. J.

## HASELTON, C. J.

Defendant, who was convicted on six counts of second-degree robbery, three counts of felon in possession of a firearm, and one count of unauthorized use of a vehicle, appeals, arguing that the trial court erred in denying his motion to suppress evidence gathered by police officers shortly after he was apprehended and transported to a hospital. He also argues that nonunanimous jury verdicts are unconstitutional; we reject that argument without discussion. As explained below, we conclude that the trial court properly denied suppression as to some of the evidence, but that the admissibility of other, material evidence was erroneous. Accordingly, we reverse and remand the three convictions that were affected by that error.[1]

In reviewing a trial court's decision on a motion to suppress, we are bound by the trial court's findings of historical fact, and all inferences consistent with those findings, as long as the findings are supported by constitutionally sufficient evidence. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). We recount the material circumstances consistently with that standard.

In late August 2009, Portland police were investigating a string of robberies that had occurred in an area of east Portland. In the course of that investigation, the police had positively identified defendant as a suspect in a robbery of a taco truck that had occurred on August 18, 2009. The police also considered defendant to be a person of interest in the other robberies.

On August 24, Officer Wilborn received information that another robbery had just occurred, at the Red Apple Bar and Grill, and that a Hispanic man, dressed in black and carrying a black revolver, was involved. Because defendant is Hispanic, and because a dark-colored revolver was thought to have been used in one or more of the prior robberies, Wilborn thought it possible that defendant was involved in the August 24 robbery, as well as in the August 18 taco truck robbery. Approximately a mile from the Red Apple,

---

[1] These convictions, pertaining to the Red Apple Bar and Grill robbery, included two counts of first-degree robbery (Counts 5 and 6) and one count of felon in possession of a firearm (Count 8).

Wilborn recognized defendant riding as a passenger in a van. Wilborn followed the van in his patrol car and initiated a stop, but defendant fled on foot.

A group of officers converged on the area, and, in apprehending defendant, an officer shot him. Defendant was arrested and taken by ambulance to the Oregon Health & Science University (OHSU). During the ambulance trip, in which a police officer accompanied defendant, paramedics removed defendant's shirt, shoes, and socks. Detective Doble met the ambulance when it arrived at OHSU, and, after defendant was taken into the hospital, Doble removed defendant's shirt, shoes, and socks from the ambulance. Shortly thereafter, Doble retrieved the remainder of defendant's clothing from the staff in the hospital's emergency room. When asked at the suppression hearing why he had seized and searched defendant's clothing, Doble testified:

> "Well, first, to see what valuables are there. Second, because the gentleman was in custody. And, third, as part of both our policy and procedures we have to inventory personal items of people that are taken into custody. And normally that includes going through pockets, closed containers, other items like that so we know what a person has or has not so when the time comes for them to be released we have an accurate depiction of what they had at the time they were in custody."

Doble took all of the items seized from defendant—along with a bullet fragment Doble collected from hospital staff after it was removed from defendant's body—to the forensic evidence division of the police department, where the items were photographed. Cash that Doble had located in the pocket of defendant's pants also was counted and photographed. Of particular pertinence here, the soles of defendant's shoes were photographed, providing a basis for comparison with imprints found at the Red Apple robbery crime scene. Doble explained that the procedure for handling personal property was to secure it properly if it was not considered evidence, but, if the item was considered evidence, it was to be "maintain[ed] properly for future prosecution." Doble further stated that he believed that all of the items he collected at the hospital were evidence, "being as there's evidence of the officer-involved shooting with it being the

blood all over everything. And I have no idea who the owner was at that time of that cash." Thus, Doble treated the items seized from defendant as evidence to be maintained for prosecution, rather than personal property to be inventoried and secured for defendant.

Shortly thereafter, Doble told Detective Hawkinson, who was in charge of investigating the string of robberies, that defendant had been "wearing white sneakers with a distinct blue band around the front toe area when arrested and transported to the hospital." Hawkinson concluded that the shoes were similar to those shown in the video of the Red Apple robbery,[2] and subsequently compared the photographs of the soles of defendant's shoes with a shoe imprint from the scene of the Red Apple robbery, and again concluded that they were similar.

Following his treatment and convalescence at OHSU, defendant was transported from the hospital to jail approximately a week after his arrest, and he remained in custody until his trial in March 2010. Defendant's belongings, including his shoes, remained in the possession of the police department. In February 2010, six months after defendant's arrest, Hawkinson applied for, and obtained, a search warrant authorizing him to seize and search defendant's clothing and shoes that were in the possession of the police department. The affidavit in support of the warrant described the cash found in defendant's clothing, as well as the distinctive features of the shoes taken from the ambulance. Of particular significance here, the affidavit described how Hawkinson had compared the photographs of the soles of defendant's shoes with the footprints at the scene of the Red Apple robbery and concluded that they were similar: "I examined a photograph of the bottom of [defendant's] shoes, and noticed that the tread of the shoes were distinct, interlaced wavy lines. I saw corresponding shoe imprints in the dirt path leading away from the [Red Apple] robbery location."

Before trial, defendant moved to suppress the items of his clothing that had been seized, including his shoes,

---

[2] The video from the Red Apple robbery did not show the perpetrator's face.

as well as evidence derived from the search of those items, including the cash found in his pants and the photographs of his shoes and the soles of his shoes. He asserted primarily that those items were not properly seized incident to his arrest on August 24, because, at that point in time, the police had probable cause to arrest him only for the August 18 taco truck robbery and that the items that Doble seized on August 24 were not pertinent to *that* robbery.[3] *See, e.g., State v. Owens*, 302 Or 196, 200-02, 729 P2d 524 (1986) (police may search incident to arrest for, *inter alia*, evidence relating to a crime for which the police have probable cause to arrest). Defendant asserted that, although at the time of his arrest on August 24, the police may have had reasonable suspicion that he was also involved in the Red Apple robbery, that reasonable suspicion could not support the seizure, because a search incident to arrest must be predicated on probable cause, not reasonable suspicion.

The state advanced several alternative theories in support of its position that the warrantless seizure of defendant's clothing and shoes, as well as the discovery and seizure of the cash found in defendant's pockets, was not unlawful. Specifically, the state asserted that: (a) the items were seized lawfully incident to defendant's arrest for the taco truck robbery; (b) defendant's clothing and shoes were in "plain view" and, thus, subject to seizure; and (c) the cash was discovered, or would inevitably have been discovered, pursuant to a valid inventory policy. In addition, the state argued that, in any event, all of those items would have been inevitably and lawfully seized and searched (including being photographed) pursuant to the search warrant that issued in February 2010.

Defendant disputed each of those alternative justifications. Of particular pertinence to our review, with respect to the state's inventory argument, defendant asserted that the police had unlawfully seized his clothing and shoes when he was transported to the hospital, and the state could not demonstrate that those items would inevitably have been discovered when defendant was transported to the jail

---

[3] We note that, at the time Doble seized defendant's clothing, the gun that purportedly had been used in both robberies apparently had already been seized— and the admissibility of that gun as evidence at trial is not at issue on appeal.

a week later. More specifically, defendant argued that an inventory policy "is only constitutional if there's going to be a transport to the police precinct or somebody is taken to the precinct, taken into custody." Defendant maintained that there was no authority, either in the inventory policy or in case law concerning inventory searches, "that it would be permissible, that they're going to take him in a week later so they can search his property now."

The trial court denied suppression. As an initial matter, the court determined that defendant's arrest on August 24 was predicated on probable cause that he had committed the August 18 taco truck robbery, but that, at that time, the police lacked probable cause with respect to the Red Apple robbery. The court further concluded that defendant's clothing and shoes were lawfully seized incident to his arrest for the taco truck robbery and that the cash found in defendant's pants pocket was discovered pursuant to a valid inventory contemporaneous with defendant's arrest and concurrent hospitalization on August 24. Given that analysis and disposition, the trial court did not reach and resolve the state's alternative inevitable discovery contentions.

Defendant was subsequently convicted of charges relating to both the August 18 taco truck robbery and the August 24 Red Apple robbery.[4] With respect to the latter, the state presented evidence comparing defendant's shoes to those worn by the Red Apple perpetrator. The state also introduced evidence concerning the cash that had been found in the pocket of defendant's pants.

On appeal, the parties substantially reiterate, albeit with considerable refinement, their contentions as to suppression. As amplified below, we affirm in part and reverse in part. In particular, we conclude: (1) Contrary to the trial court's reasoning, defendant's clothing and shoes were not lawfully seized incident to defendant's arrest for the taco truck robbery; (2) Doble's conduct in initially securing defendant's clothing and shoes and determining whether the clothing

---

[4] *See* 257 Or App at 3 n 1 setting out the counts pertaining to the Red Apple robbery.

contained valuables, which yielded the cash discovered in defendant's pants pocket, was lawful as undertaken pursuant to a valid inventory policy; (3) however, Doble's subsequent retention and processing of defendant's clothing and shoes as evidence, including photographing defendant's shoes (including their soles) exceeded the scope of a lawful inventory and, hence, constituted an unlawful seizure and search; and (4) the state failed to adduce sufficient evidence that defendant's clothing and shoes would inevitably have been lawfully subject to seizure and search pursuant to the subsequently obtained February 2010 search warrant.

We begin with the initial, warrantless seizure of the clothing, shoes, and cash on August 24. The state has the burden to show that a warrantless seizure or search comes within an exception to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). One such exception is for a search incident to arrest, and, in *Owens*, 302 Or at 200, the court summarized the requisites of that exception:

> "[T]he arrest must be for a crime, evidence of which reasonably could be concealed on the arrestee's person or in the belongings in his or her immediate possession at the time of the arrest. Thus, for example, if the person is arrested for a crime which ordinarily has neither instrumentalities nor fruits which could reasonably be concealed on the arrestee's person or in the belongings in his or her immediate possession, no warrantless search for evidence of that crime would be authorized as incident to that arrest."

Here, as noted, the trial court reasoned that the seizure of defendant's shoes and clothing was lawful incident to his arrest for the taco truck robbery. On appeal, defendant disputes that reasoning, asserting:

> "[T]he state presented no evidence that, at the time of the seizure, any officer had observed anything about either the shoes or the clothing that gave rise to any belief that they had any evidentiary value with respect to any crime committed by defendant, let alone the crime for which he is arrested—the robbery of the taco stand six days [earlier]."

We agree. The record is devoid of any objective nexus between what defendant was wearing on August 24 and the August 18 taco truck robbery. Further, as for the cash found in defendant's pocket, the record is devoid of testimony by officers as to the requisite belief that the fruits of the taco truck robbery—that is, the crime of arrest—reasonably could be found on defendant's person nearly a week later.[5] Accordingly, the trial court's "search incident to arrest" rationale for denying suppression of defendant's shoes, clothing, and derivative evidence was erroneous.

We proceed to the state's alternative argument that the seizure of the shoes and clothing and the discovery of the cash was lawful as the product of an inventory on August 24. As explained below, we conclude that: (1) Doble's initial securing of defendant's clothing and shoes and his discovery of the cash in defendant's pants pocket was lawful, as comporting with valid inventory policies; but (2) Doble's subsequent retention and processing (including photographing) of those items as evidence of a crime exceeded the permissible scope of the valid inventory and, hence, constituted an unlawful seizure and search.[6]

As noted, in his testimony at the suppression hearing, Doble stated, "as part of both our policy and procedures we have to inventory personal items of people that are taken into custody." *See* 257 Or App at 4. Before the trial court, defendant contended that Doble's asserted invocation of the inventory procedures authorized by the Portland City Code (PCC) was premature because, when Doble secured his clothing and shoes, and consequently discovered the cash, on August 24, defendant was not in custody—and would not

---

[5] The state also makes a cursory argument that Doble had "probable cause" to seize the disputed evidence because defendant had been shot by a police officer. To the extent that the state argues that Doble's knowledge that defendant had been shot by a police officer equated to a reasonable belief that "defendant had done something to provoke the shooting"—and, thus, his belongings were subject to seizure—we reject that argument without discussion. Further, even assuming that, as an abstract matter, defendant's clothing and shoes might have some probative value in an internal review or other administrative proceedings pertaining to the circumstances of the shooting, that circumstance would not fall within any recognized exception to the warrant requirement of the Oregon Constitution.

[6] We reject without discussion the state's apparently related "plain view" argument.

be until a week later when he was lodged in the jail. Defendant further posited that the state had failed to show that those items would still have been available for an inventory by the time he was transported from OHSU to the jail. The trial court, in rejecting those contentions by concluding that the cash was properly inventoried, necessarily credited Doble's testimony that, in initially securing defendant's clothing and shoes and discovering the cash, he was effecting an inventory (as opposed to merely acting for a criminal investigative purpose).

That disposition, in turn, implicates the proper application of the PCC provisions pertaining to inventories—and, particularly, the temporal trigger for the implementation of those procedures. Under PCC 14C.10.010, the procedures apply to "the personal possessions of a person in police custody." Defendant's "premature inventory" argument, as we understand it, is that the inventory procedures were inapplicable on August 24, because he was only "constructively" in custody when he was taken to OHSU and that he was not actually in custody until transported to the jail approximately a week later. Even accepting *arguendo* defendant's premise that he was only "constructively" in custody on August 24, that argument misapprehends the scope of the prerequisite "police custody." Under PCC 14C.10.020.D.1, "[p]olice custody" is defined, in pertinent part, as being restrained "as a result of an 'arrest' as that term is defined at ORS 133.005(1)." ORS 133.005(1), in turn, defines "arrest" as "to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging that person with an offense." Consequently, even if defendant was only in "constructive custody" at the time that Doble initially secured his clothing and shoes and discovered the cash—a dubious premise, given that defendant had been handcuffed and placed under arrest before being transported to the hospital—he was, nevertheless, in "police custody" for purposes of the PCC inventory policies on August 24. Further, the PCC policies direct police officers to complete the inventory of the personal property in the possession of a person taken into custody, and to make note of any valuables located during the inventory. PCC 14C.10.040.C - E. Accordingly, Doble's

discovery of the cash was within the authorized scope of the applicable inventory policy.

That, however, does not end the inquiry. As noted above, although Doble testified that he was required to conduct an inventory, he ultimately seized defendant's possessions and processed them as "evidence." Notwithstanding that defendant's temporal/"premature inventory" argument is unavailing as to Doble's initial securing of defendant's personal belongings and discovery of the cash, that does not resolve the lawfulness of Doble's *subsequent processing of those items as evidence of a crime, including photographing the shoes, and retaining those items as evidence.* Nothing in the PCC inventory policy provisions to which we have been directed, *see, e.g.,* PCC 14C.10.040.E,[7] purports to authorize such processing of a defendant's personal property. *See State v. Atkinson,* 298 Or 1, 10, 688 P2d 832 (1984) (reasoning that "[t]he degree to which an inventorying officer may scrutinize the items uncovered is limited" and that an officer must not deviate from the "established policy or procedures of the particular law enforcement agency").

Further, such processing cannot be reconciled with the rigorously circumscribed purposes of a lawful administrative inventory. As we have explained,

> "[t]he police need to determine the nature of the property that they are holding for three principal reasons: (1) protection of the person's property while it is in police custody; (2) reduction or elimination of false claims against the police for lost property; and (3) protection against possible injury from impounded but uninventoried property. None of those purposes involves searching for evidence of a crime."

*State v. Guerrero,* 214 Or App 14, 18, 162 P3d 1048 (2007) (citation omitted).

---

[7] PCC 14C.10.040.E provides:

"E. All items of personal property neither left in the immediate possession of the person in custody nor left with the facility or agency accepting custody of the person, will be handled in the following manner:

"1. A property receipt will be prepared listing the property to be retained in the possession of the respective police department and a copy of that receipt will be tendered to the person in custody when the person is released to the facility or agency accepting custody of such person;

"2. The property will be dealt with in such a manner as directed by the Chief of such officer's department."

In photographing defendant's shoes and clothing for criminal investigative purposes and in ultimately retaining those items as evidence, Doble exceeded the scope of a lawful inventory and effectuated an unlawful warrantless search and seizure. As noted, those items—and, most significantly, the photographs of defendant's shoes—were admitted at trial. Thus, the admissibility of that evidence depends, finally, on the state's ultimate alternative contention—*viz.*, that defendant's clothing and shoes would inevitably have been lawfully seized and searched (including being photographed) pursuant to the February 2010 warrant.[8]

The gravamen of the state's contention is that the otherwise unlawfully obtained evidence "inevitably would have been discovered, absent the illegality, by proper and predictable police investigatory procedures." *State v. Miller*, 300 Or 203, 225-26, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986). The state bears the burden of proof of demonstrating the requisites of such inevitable discovery. *State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005).

Before addressing the substance of the state's contention and defendant's response, we emphasize three salient features of this case that distinguish it from the "typical" inevitable discovery case and that are central to our analysis and disposition. *First*, unlike the generality of inevitable discovery cases, in which the asserted mechanism of inevitable discovery is causally distinct from the initial unlawful seizure or search, here, as noted, the application for the February 2010 warrant relied, in part, on information derived from the unlawful photographing of the soles of defendant's shoes. *See* 257 Or App at 5. Thus, there was a certain degree of "bootstrapping." *Second*, unlike in most inevitable discovery circumstances, in which the putative lawful discovery would have occurred close in time to the

---

[8] The February 2010 warrant also authorized the seizure of the cash found in defendant's pants pocket. In our discussion, which follows, of the inevitable discovery argument predicated on that warrant, we focus on defendant's clothing and shoes—and especially the latter—both because (1) we do not understand defendant to contest the admissibility of the cash if (as we have concluded) the cash was initially discovered pursuant to lawful inventory procedures and (2) defendant's assertions of prejudice from the allegedly erroneously admitted evidence pertain very substantially, albeit not exclusively, to the photographs of the shoes with their purported nexus with the Red Apple robbery.

unlawful conduct, in this case, the asserted "inevitable" lawful seizure and search occurred roughly six months after the initial, unlawful search and seizure.[9] *Third*, because the trial court never reached the state's inevitable discovery argument based on the February 2010 warrant, it made no pertinent findings on factual issues on which the state bears the burden of proof.

We return to the fundamental inquiry. To prevail on its inevitable discovery contention, the state must establish that defendant's shoes and clothing would have been subject to seizure and search under the February 2010 warrant. That, in turn, implicates two subsidiary inquiries, one legal (relating to the first consideration in the preceding paragraph) and the other, factual (relating to the second consideration): (1) Were defendant's shoes and clothing *lawfully* subject to seizure (and consequent search) pursuant to the February 2010 warrant—and, specifically, with the tainted/"bootstrapped" material excised from the application, was that warrant nevertheless supported by probable cause?[10] (2) But for Doble's unlawful retention of defendant's shoes and clothing, would those items *in fact* still have been available for seizure pursuant to the warrant six months later?

In this case, we need not address the initial question concerning the issuance of the warrant because, even assuming that the warrant properly was issued and authorized the seizure of the disputed evidence, we conclude that the state failed to adduce legally sufficient evidence to

---

[9] *See, e.g., State v. Paulson,* 313 Or 346, 353, 833 P2d 1278 (1992) (discussing potential applicability of inevitable discovery doctrine where medical personnel would have discovered evidence shortly after police arrived); *State v. Seal,* 138 Or App 693, 698-99, 910 P2d 394, *rev den,* 323 Or 483 (1996) (evidence found during search incident to arrest would inevitably have been found during jail booking shortly thereafter); *State v. Larsen,* 89 Or App 260, 263, 748 P2d 555 (1988) (evidence found during unlawful search of vehicle would inevitably have been found shortly thereafter when vehicle was towed).

[10] *See, e.g., State v. Hartman,* 238 Or App 582, 592, 243 P3d 480 (2010), *modified on recons,* 241 Or App 195, 248 P3d 448 (2011) (rejecting warrant-based inevitable discovery argument where, once information obtained as a result of original unlawful seizure of evidence was excised from application for subsequent warrant to seize the same evidence, the warrant application was insufficient to establish probable cause).

support a determination that, in fact, it inevitably would have been able to seize the disputed items pursuant to that warrant.

In order to prevail on its inevitable discovery argument, the state was required to establish that, as a *factual* matter, those items would still—notwithstanding Doble's unlawful conduct—have been available for seizure in February 2010. That is, as a practical matter, the question is whether, but for the unlawful retention of those items as evidence, the execution of the February 2010 warrant "would have resulted in the discovery of the evidence in question." *Miller*, 300 Or at 226. As noted, the state has the burden of proof in that regard—and, as also noted, the trial court did not reach that matter and, hence, made no factual findings concerning it. *See* 257 Or App at 13.

In that posture—with respect to alternative grounds for affirmance raised before, but not resolved by, the trial court—we will ordinarily remand to the trial court to determine potentially dispositive questions of fact in the first instance. But we do so only if the evidence, with nonspeculative derivative inferences, is legally sufficient to permit the trial court to endorse the alternative ground. Otherwise, a remand for reconsideration would be gratuitous. *Compare State v. Dorey*, 100 Or App 457, 462-63, 786 P2d 1288, *rev den*, 310 Or 133 (1990) (where there was conflicting evidence on the voluntariness of statements and the trial court had not resolved the factual dispute, remand for factfinding on that issue was required), *with State v. Grover*, 193 Or App 165, 90 P3d 8 (2004) (remand for additional factual finding was unnecessary where, based on the record, only one factual finding on the unresolved issue would be possible).

With that sensibility, we refer to precedents addressing the sufficiency of evidence proffered in support of analogous inevitable discovery contentions. Because *State v. Johnson*, 177 Or App 244, 35 P3d 1024 (2001) (*Johnson I*), and *State v. Johnson*, 335 Or 511, 73 P3d 282 (2003) (*Johnson II*), are especially instructive, we describe each at some length.

The two *Johnson* cases, while procedurally distinct, arose from the same prosecution, in which the defendant was charged with aggravated murder. Officers were investigating the crime (evidence at the homicide scene included a partial shoe sole impression, apparently left by a heavy work boot) and identified the defendant as a person of interest. They arrested the defendant on an unrelated probation violation and noticed that the defendant's work boots were "consistent" with the tread print at the crime scene. 335 Or at 514. The officers seized the defendant's boots without a warrant and then processed them as evidence of the homicide. *Id.* After the defendant was indicted for murder, he moved to suppress, *inter alia*, the boots as having been unlawfully seized. *Id.* The state responded by arguing, in part, that, regardless of the lawfulness of the initial seizure, the evidence would inevitably have been discovered pursuant to a lawful inventory. *Id.* The trial court granted the motion to suppress. *Id.* at 515.

At that point, the state pursued two divergent courses. First, the state appealed the trial court's suppression order, culminating in our decision in *Johnson I*. Second, and concurrently (as amplified below), the state applied for a search warrant authorizing the seizure of the boots and other clothing items still retained in the police department evidence locker, a course which culminated in the Supreme Court's decision in *Johnson II*. 335 Or at 515-16.

In *Johnson I*, as before the trial court, the state advanced an inevitable discovery argument, based on testimony presented during the suppression hearing, that, if the defendant's property had not been taken as evidence, "'it would have gone with the defendant to the jail and been seized by the jail staff and placed in their inventory of property.'" 177 Or App at 250. We concluded that that testimony did not establish that the boots and other items would have been inevitably discovered:

> "At best, that testimony establishes only that the evidence would have been taken into inventory at the jail, not that the police would inevitably have seized the evidence and held it until trial. The testimony does not address how long the clothing would have been kept in the jail, whether it

would have been released to a relative or friend of defendant's if he had so requested, or any steps that the police would have had to take to obtain a transfer of items in the jail's possession. Those are all things that defendant could have done with the clothes, because they remained his property while he was in custody."

*Id.* (footnote omitted). We further rejected an alternative inevitable discovery argument by the state, to the effect that the state could have successfully sought and obtained a warrant authorizing the seizure of the disputed items:

"The state also argues that it 'presented evidence that the detectives would have included in their search warrant application a request for authorization to seize the clothing.' However, the only relevant testimony at the portion of the transcript cited by the state is testimony by Officer Stoelk: 'I had the affidavit [in support of a search warrant application], and I could have perfectly easily put that information in the affidavit and seized it.' As noted above, in its decision in *Miller*, 300 Or at 226, the court emphasized that for the inevitable discovery doctrine to be applicable it must be shown that the evidence *would have been* discovered absent the illegality by proper and predictable investigatory procedures and that '[i]t is not enough to show that the evidence "might" or "could have been" otherwise obtained.' The officer's belief that he could have obtained a warrant is not sufficiently certain to satisfy the inevitable discovery doctrine."

*Id.* at 252-53 (emphasis and brackets in original). Consequently, we affirmed the trial court—and the state did not seek review of our decision.[11]

Meanwhile, *Johnson II* was evolving. While the state was pursuing its inevitable discovery arguments on appeal in this court, culminating in *Johnson I*, it had also "appli[ed] for a search warrant authorizing a new seizure of the clothes [including the boots]." *Johnson II*, 335 Or at 515. The affidavit in support of that warrant related circumstances pertaining to probable cause and "stated that the police had seized the clothing and had retained it at the Salem Police Department because of 'exigent circumstances.'" *Id.*

[11] In *Johnson II*, the Supreme Court observed, "The state acknowledges that, in choosing not to seek review, it abandoned any argument that the initial warrantless seizure was lawful." 335 Or at 516 n 3.

In September 1999, while the state's appeal of *Johnson I* was pending, a magistrate issued that warrant. Following the issuance of that warrant, the state argued to the trial court that, because it had "re-seized" the disputed evidence lawfully pursuant to the warrant, it was admissible into evidence regardless of the disposition of *Johnson I*. *Johnson II*, 335 Or at 516. In response, the defendant again moved to suppress, asserting, in part, that "the police had held the property in their own evidence room [and] had denied [the] defendant's request for return of the property." *Id*. The trial court rendered findings of fact that the defendant had, in fact, requested that the items be returned through his girlfriend and that, "in any event, the police would not have released" the items. *Id*. at 517.

The state, on a motion for reconsideration, presented evidence in support of its assertion that, if the items had been turned over to the girlfriend, the police would have been able to recover those items from her. *Id*. at 517-18. Ultimately, on reconsideration, the trial court was unpersuaded that, "'if the State had not seized [the] defendant's property[,] *** the State would have been able to locate and seize [the] defendant's property pursuant to a valid search warrant'" and, accordingly, adhered to its prior ruling on suppression. *Id*. at 518. In so ruling, the trial court observed:

> "'[I]t's a whole series of if this, then this. But had the defendant's property been in the Marion County Jail and had he asked for it to be released to [his girlfriend] and had the jail actually released it to [the defendant's girlfriend] that it would have remained in a place that the police agency[,] had they discovered their mistake, would have been able to find it or find her and[,] *** based on the evidence that I have, I just can't make that finding that it would more likely than not have been in a place where the police agency would have been able to find it.'"

*Id*. at 525-26.

The state then appealed to the Oregon Supreme Court.[12] The Supreme Court first explained that, despite the issuance of the warrant, in circumstances where the

---

[12] Between *Johnson I* and *Johnson II*, the legislature had enacted ORS 138.060(2), providing for direct appeals to the Supreme Court in state's appeals of orders granting suppression in certain types of cases.

disputed evidence had initially been seized unlawfully, the presumption that evidence seized pursuant to a warrant was lawfully obtained did not apply, and "the burden of proof fairly may be shifted to the government to show that the evidence is not tainted by the misconduct." *Id.* at 521. The state asserted that it had met its burden in that regard, because it had presented evidence that, "even had the evidence been stored as inmate property and been released to [the defendant's girlfriend], its new location would have been discovered and the search warrant would have been executed there." *Id.* at 522-23. The Supreme Court, while acknowledging that contention and its evidentiary support, rejected it as unavailing under the controlling standard of review, *viz.*, that,

> "unless the evidence in a case is such that the trial court as finder of fact could decide a particular factual question in only one way, we shall in the future consider ourselves * * * bound by a trial court's acceptance or rejection of evidence."

*Id.* at 523.

Applying that standard, the Supreme Court canvassed the evidence as to the requisites of the Marion County inventory policy and the countervailing testimony as to how, or whether, the defendant's girlfriend would have retained or maintained the items if they had been released to her upon request. *Id.* at 523-25. The Supreme Court concluded:

> "It may be true that the state of the evidence is such that the trial court *could* have found that the state had met its burden. It might even be true that, if this court were empowered to review the evidence *de novo*, we would make such a finding. However, we cannot say that the evidence was of such a character or of such weight that the trial court was required to rule in the state's favor. It follows that the trial court's ruling that the state had failed to meet its burden of proof was a permissible one to which we must, and do, defer."

*Id.* at 526 (emphasis in original). Accordingly, the Supreme Court affirmed the order of suppression.

We return to the circumstances of this case. Again, the predicate factual question, which the trial court did not

reach and resolve, is whether, but for the unlawful seizure of defendant's shoes and clothing, those items would still have been available six months later for seizure pursuant to the warrant. Even more precisely, for purposes of our appellate disposition, is there legally sufficient evidence in this record from which the trial court *could*, on a potential remand, resolve that question in the state's favor? Again, if there is not, a remand for that determination would be gratuitous— indeed, improper. *See* 257 Or App at 14.

Here, the state presented evidence that, under the pertinent provision of the Portland Police Bureau's policy, once a person whose property has been inventoried by the police is transferred to a detention facility, the police "will handle the detainee's personal property in accordance with the detention facility's policies." Portland Police Bureau Policy 650.00. The state also presented evidence by Detective Hawkinson that, to the best of his knowledge, defendant had not tried to retrieve the disputed evidence from the police before the warrant issued. The state did not, however, put on any evidence of the inventory policies of the detention facility where defendant was held, or even, in fact, any evidence of where defendant was being detained.

Thus, the record in this case was, and is, deficient in the same respect as that in *Johnson I*. That is, the proof that the state proffered in support of its inevitable discovery argument did

"not address how long the clothing would have been kept in the jail, whether it would have been released to a relative or friend of defendant's if he had so requested, or any steps that the police would have had to take to obtain a transfer of items in the jail's possession. Those are all things that defendant could have done with the clothes, because they remained his property while he was in custody."

*Johnson I*, 177 Or App at 250. Given those gaps and deficiencies in proof, the trial court here could not on remand find that defendant's clothing and shoes would, in fact, have been inevitably retained under operative inventory processes and, thus, still subject to seizure pursuant to the warrant after a lapse of six months. On this record, such a determination

would be insupportably speculative.[13] Accordingly, we reject the state's warrant-based inevitable discovery alternative basis for affirmance and conclude that the trial court erred in denying defendant's motion to suppress with respect to the clothing and shoes and the derivative evidence.

The remaining question is whether that error is harmless with respect to any of defendant's convictions. Evidentiary error is harmless if there is "little likelihood that the particular error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). The erroneous admission of evidence is harmless "if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict." *Id.*

The evidence in question is directly pertinent to two counts of first-degree robbery (of two individuals inside the Red Apple) (Counts 5 and 6) and one count of felon in possession of a firearm (concerning defendant's possession of, and threatened use of, a firearm at the Red Apple) (Count 8). Given, especially, the linkage of defendant's shoes with the Red Apple robbery, we reject without further discussion the state's contention that any error with respect to those counts was harmless.

The remaining convictions were four counts of second-degree robbery (four people in the taco truck on August 18), one count of felon in possession (during the taco truck robbery on August 18), one count of unauthorized use of a vehicle (used during the taco truck robbery on August 18), and an additional count of felon in possession relating to defendant's possession and threatened use of a firearm when he was apprehended on August 24.

Defendant makes a nonspecific argument that the admission of the disputed evidence was prejudicial as to the counts relating to the taco truck robbery on August 18 and to his apprehension on August 24. We disagree. Two

[13] The state urges us to affirm the denial of suppression because, unlike in *Johnson II*, the defendant here "presented no evidence that, had the shoes been returned to his personal possession, he would have somehow gotten rid of them." That argument, however, misapprehends and misallocates the burden of proof on the issue of inevitable discovery. Defendant did not have the burden to demonstrate that the state inevitably would *not* have discovered the evidence—rather, the state bears the burden of demonstrating that it would have.

of the victims positively identified defendant as the robber involved in the taco truck robbery, and the woman who drove him to and from the site of the robbery also testified against defendant at trial concerning that robbery. With respect to the unauthorized use of a vehicle charge, one of the robbery victims observed the license plate number of the vehicle used in the robbery and reported it to the police, who determined that it had been rented to a man who had loaned it to defendant, and who reported that defendant had failed to return the vehicle to him as agreed. None of that evidence with respect to the crimes surrounding the taco truck robbery has any overlap with the disputed evidence concerning the Red Apple robbery that occurred approximately a week later. Without belaboring the point, we conclude that any error with respect to the disputed evidence related to the Red Apple robbery bore no relationship to the jury's determination of its verdicts on the counts pertaining to the taco truck robbery.

We reach the same conclusion with respect to the felon in possession charge that related to defendant's capture on August 24. Although that crime occurred in temporal proximity to the Red Apple robbery, the challenged evidence was immaterial to the culpable conduct on which that charge was based—*viz.*, defendant's possession of a firearm found on his person after he unsuccessfully attempted to avoid arrest for the taco truck robbery the week before. Again, without belaboring the point, we conclude that the disputed evidence did not affect the jury's verdict on this count.

In sum, we conclude that the trial court properly denied suppression as to the cash found in defendant's pants pursuant to a lawful inventory, but erred in denying suppression of evidence of defendant's clothing and shoes as properly seized incident to arrest. Thus, defendant's convictions on Counts 5, 6, and 8 are reversed and remanded. Finally, we affirm defendant's remaining convictions on the ground that any error in denying suppression was harmless as to those convictions.

On Counts 5, 6, and 8, convictions reversed and remanded; remanded for resentencing; otherwise affirmed.